Good morning, Your Honors, and may it please the Court, Karen Baumholt for Appellant Intercontinental Industries Corporation. I would like to reserve five minutes for rebuttal. My client bought a business from an LLC, a quintessential commercial transaction, and it turned out that the entire transaction was an unfortunate scheme to defraud U.S. investors out of their property in China. Now, this case has been around, unfortunately, for a long time, and I've read the case law more times probably than I'd like to, but once again, as I began to prepare for today and I took a step back, I was once again struck and reminded that when you look at the case law that covers all the circuits and the Supreme Court, our case isn't like any of the cases where the courts say, no, this really isn't for the U.S. courts. And courts have said that the Foreign Sovereign Immunities Act is sort of a complicated mess, not in quite those words, but when you review the case law, the theme is almost really you know it when you see it, even when you get down to the Supreme Court's decision in Sachs. And you get cases like Sachs where the Supreme Court has said, look, a lady falling on the railroad tracks in Austria and isn't really have any connection to the United States except she bought her ticket here, that's not the kind of case that we're going to say falls within the commercial activities exception. But on the other hand, we get cases that come after Sachs like Atlantica Holdings where the courts have said, when you direct misrepresentations to people in the United States in like the sense of a business transaction, securities, fraud, things like that, those are the kind of cases where we're going to take a different look. And in my case, in this case, when the tie to the United States is over the course of a couple of years, different people, and I'll get to the parties issue that's been briefed in a moment, different people went to the United States, targeted my client specifically, buy this factory, send us your money, and then successfully grab that U.S. company's technology in China, force it out, send a pittance to my client to a U.S. bank account here in Los Angeles, that's the kind of case that Congress through the FSIA meant to have heard in these courts. Counsel, when you talk about cases like Atlantica and EIG Energy Fund, and those are I think in many ways easier to sort of figure out what the gravamen of the suit was about because they're really fraud-based claims. Your case is harder because so much of it was really based on contractual relationship and the breach and the termination that really occurred in China. Can you talk about, particularly for the contract-based claims, what evidence of direct effects or allegations of direct effects the termination of the contractual relationship have in the United States? Sure. And I would like a chance to address whether or not we are actually closer to Atlantica Holdings, but let me turn to direct effects first. So I think defendants essentially do argue that the case is based on acts in China in connection with commercial activities abroad. So they essentially concede that point. And the crux of the question is, where's the direct effect in the United States for the misconduct abroad? So let me start with one piece of the puzzle on that, which is that there's a lot of case law talking about mere financial loss not being enough. And that's the phrase that's used, and I agree that mere financial loss is not enough, but what does that really mean in the context of the case law? Atlantica Holdings actually, again, really gives the court something important to think about there, which is that in most of those mere financial loss cases, we're talking about a downstream event. The price of oil changes, that affects someone somewhere in the U.S. What Atlantica Holdings points out is that when you're talking about harm to a corporation where the injury itself that's alleged in the case is economic injury, that isn't the sense of mere financial loss that the cases are talking about. So we have an issue here where there is financial loss to my client, and it's relevant. My client is a U.S. company. It suffered financial loss here. And the Supreme Court in Weltover even endorsed the Second Circuit's view that an act that places the plaintiff in immediate financial peril is enough. So we do have the financial loss piece, which I don't think can be ignored. In addition to the financial loss, my client lost its bargain for contract, the 2005 contract, as a result of the 2008. There were effects on U.S. companies here. Let me start with Wells Art. Wells Art is a U.S. company with whom my client had a contract that it could not fulfill as well as a result of the wrongful conduct of the defendants abroad. The response that we get from the defendants on this is, well, that Wells Art contract, which is that – oh, pardon me. I don't have the ER site here. It looks like approximately 578. The defendant's response is it has an FOB provision that is in China. And to that I say, so what? FOB deals with the risk of loss when the items are placed with a carrier. What's relevant in Wells Art is that my client was unable to fulfill its order to a U.S. company as a result of the defendant's wrongful conduct. That's a direct effect that would satisfy any of the cases that we've cited. We also believe that there were other U.S. contracts that were lost as a result of this scheme. The problem that my clients have is that they're able to testify to that fact, and we have two declarations from J.C. Chau and Tim Chau talking about that very topic. But when the 2008 contract terminated this whole deal, the defendants kept all of the documents. And what the record shows you is that, one, the defendants have said over and over again, only Mr. – well, both Chaus, my clients, J.C. Chau and Tim Chau, Intercontinental, would know about the U.S. contracts. They're the only ones who would know because they were running the factory at the time. And second, the defendants have destroyed or lost materials from that timeframe. Now, I'm not talking about spoliation, whether it was done intentionally, but the evidence is that there were other U.S. contracts that were lost. Then the other direct effect is, Your Honor, when it came to unwinding this whole deal in 2008, my client was to receive payment in Los Angeles at the International Commercial Bank of China, and Adler, one and two, both from this court, teach that even that small amount could do it. Cases like Adler, cases like Siderman, cases like Atlantica tell us that the difference, as simplistic as it may be, is what's happening in the United States and how does it relate to what occurred abroad. And, Your Honor, after the contract was signed in 2005, was it, and money was basically – did the parties succeed in business together before it all started to fall apart? Well, the parties weren't really in business together in that sense. My client bought the factory, began to run it, it began to turn a profit, and then – What was that time period, about a year? I think that the record would show it was approximately 2007, but I'd have to check. It was in 2007, I believe, where things began to fall apart, and by 2008 is when the second contract was entered into. But I need to confirm those exact dates for Your Honor. No, that's fine. I can look at the record again. So if we were to analyze this case as this was – your theory is that this was a fraudulent scheme from the beginning, so you're tying it all the way back from the initial negotiations, all the way through the signing of the 2005 contract, and then beyond when it all fell apart. There was some sort of big fraudulent scheme hewing the facts close to Atlantica. If we were to disagree with that approach and say this was really a contractual-based relationship where the contract was executed overseas, all of the operating of the business and purchase of this factory was done overseas, can we then separate some of your fraud-based claims from the contractual claims? And to say, well, the analysis may differ with regard to the fraud claims because a lot of the misrepresentations were done in the United States. And if the answer is yes, we can separate that, then what's your best case for that approach? I guess I'm not sure what the court means by separate the two. Oh, you've got contract-based claims. Right. You've got fraud-based claims. Right. You want it to be one big fraudulent scheme, and that's the gravamen of the case under your theory. If we were to disagree with that and look at this case as they're contract-based claims, which would be barred by the Foreign Sovereign Immunities Act, but let's take a closer look at the fraud-based claims, which involve a lot of misrepresentations that appear to be done in the U.S., can we separate those two claims? I think I understand the court's question. And if we can separate the two claims, what case best stands for that proposition? Well, and I think the answer is that, well, let me start with SACS. The Supreme Court has said in SACS, we're not addressing today what we do when there are multiple causes of action where the gravamen may be different. And the cases since SACS haven't really tackled that question either. I do think Atlantica does speak to this because Atlantica says, look, although there's an element of contract and breach of contract here, the real gravamen of the claim is that there were fraudulent misrepresentations made in the offering materials for those securities. I don't think there's been a case that has, since SACS, tackled this. And I don't disagree with the court. The breach of contract claim does seem to be more rooted in China than the fraud claim. But really the core, I do think that the core of our claim is this was a scheme. There were misrepresentations made at the outset that Hubei would approve and protect my client's investment, help resolve business disputes in its favor, receive ownership of the factory, and would be fully responsible for those debts. And part of that is, I mean, to us that is the core of what happened here. It was all a fraudulent scheme. I don't think the court can separate each cause of action. I think you look at the gravamen and SACS doesn't really tell us what to do. Well, are your damages the same? Are they coextensive if it's a fraud claim versus your contract claim? Well, the fraud claim would carry with it the possibility of punitive damages, while the breach of contract claim might not. But otherwise the damage would, the underlying economic damage would be the same. So does it matter? Because the fraud claims arise from the alleged misrepresentations made in the United States. So that's one prong of the exemptions. And then the contract claims, it's pretty clear the breach occurred in China, but that would be the direct, then you need to show the direct effects. Right. If you were going to separate them and analyze them under different prongs, if the breach of contract claim is what we're focused on, then direct effects. Or I think the prong two also would work because prong two deals with acts performed in the United States in connection with commercial activity abroad. So there's definitely acts that are taking place in the United States that may be in connection with that commercial activity abroad. However you view the activity or what the gravamen is, I think we get to the same place. And yes, I think direct effects is the easiest prong to achieve if you believe that really the gravamen of the case is in China. If I could, well, I see that I'm running out of time. I would like the court to, once we have achieved jurisdiction under the Foreign Sovereign Immunities Act, to consider the active state and personal jurisdiction arguments that were made. And the reason for that is those are going to be reviewed. But the district court didn't consider those. The district court did not. And the court has discretion, I grant you, and often the court will remand. But this was fully briefed below twice. And the case has been pending for a very long time. Whatever the result, if we are sent back to brief those issues, I'm confident we'll be back here again two years from now. And so we think the court can resolve those de novo issues on this appeal, and we would ask that it do so. I see that I'm running short on time, so I'd like to reserve the remainder of my time for rebuttal. All right. Thank you, counsel. Good morning. I'm Alicia Dagan, appearing on behalf of the two respondents. The People's Government of Hubei Province, which is a first-level subdivision of the People's Republic of China, and Wuhan Industrial Holdings Group Company, which is a state-owned company that owns and manages properties for the city of Wuhan, not for Hubei Province. There is no dispute that Hubei Province and Wuhan Holdings are presumptively immune from suit. And we're back before this court after a year of very intensive proceedings where Intracontinental, or IIC, had an opportunity to amend and an opportunity to seek jurisdictional discovery, and we still don't have any facts that they can point to to show clear error in the district court's jurisdictional findings. And we believe the judgment of dismissal for lack of jurisdiction should be affirmed. I'd like to turn to the court's questions about the based-upon requirement. The... We think Sachs is very clear that in determining whether a suit is based upon particular conduct, you have to look at the gravamen of the suit. Sachs rejected the idea that you would look at an element-by-element analysis of the conduct, and Nelson rejected the claim-by-claim approach. Sachs, in fact, noted that Nelson had looked at the suit as a whole rather than going through and assessing claim-by-claim. So we think that in deciding the based-upon question here, as the district court did, the court should look for the gravamen of the suit. What is the conduct that underlies every one of IIC's claims? And that conduct here is the breach and interference of the 2005 contract in China. Without those events in China, there would be no claim. There'd be no breach of contract claim, no interference claim, and no fraud claim. There was the mention of footnote 2 out of the Sachs case, and what we would say there is whatever case the Supreme Court was keeping open for that reference in footnote 2, this is not one of those cases. In fact, this case actually is similar to the failure to warn claim that was at issue in Sachs, where there was nothing inherently wrongful about the sale of the Ural Pass, and there was no harm to the plaintiff until you got to the events that occurred in Austria when she was actually injured. Here, even if we focus on Mayor Lee's statements, which we don't think would be sufficient to trigger the commercial activity of Prong in the first place because he's alleged to have done things like make assurances of government support for an investment. But even setting that aside, IIC wasn't harmed until they took their money, they went to China, they bought a factory, and things didn't go the way they had hoped in China. So the injury occurred in China from all of the events that occurred in China, and so we would believe that based upon Prong, the gravamen of this suit is the events in China. And that's, I think, one of the big distinctions with Atlantica. Atlantica makes clear, this Court in Terranquean made clear, that these downstream effects to a U.S. entity are not sufficient to ground jurisdiction. And turning to the direct effects. Yeah, I think this case turns on the direct effects. And so there seems to be an issue of fact as to whether or not there were executed contracts with third-party U.S. corporations that were not fulfilled as a result of the breach, or the breach of the contract in China. Is that correct? Your Honor, that is the allegation here. And the Supreme Court in Weltover made clear that for an effect in the U.S. to qualify as a direct effect for the commercial activity exception, that the effect must follow as an immediate consequence of the defendant's activity. And we have seen in a number of cases acknowledging that where a contract contemplates performance in the United States, that the breach of that contract could result in a direct effect in the United States. This Court noted that. What about what counsel said about the last contract? I forget the company's name now. They had a contract that they couldn't fulfill because of the conduct that occurred in China, including barring intercontinental managers from the facility. Certainly, Your Honor. I believe that's the Wells Art contract that the Court is referring to. And that contract is in the record at 563 of the excerpts. And that's a contract between IIC, which is identified in the contract as a Chinese company. The contract was executed in China. It does not provide for any U.S. place of delivery. In fact, the only reference to performance is this FOB seller contract that would indicate that the risk of loss would pass to the buyer when the product is given to the transport in China. And as the District Court noted, there are all sorts of other uncertain terms in that contract, such as price, timing, where the delivery, even if you're just giving it to the transport, where is that going to go? And all of that would need to be the subject of further negotiations and further agreements before you could even get to some potential downstream effect in the United States. And given that uncertainty, as the District Court recognized, we can't even assume that there eventually would be an effect in the United States, immediate or not, from IIC's eventual breach of that contract. And even if we could assume that there would be some effect, it is several steps down the road from the breach of the 2005 contract in China. It would be after further negotiation, after further agreement, and after IIC's own breach of the contract. That is not the immediate consequence that Weltover contemplated. And that's where, as the District Court noted, a number of courts have recognized that you can't have that immediate consequence from the breach of the contract in suit unless you have a tie to these U.S. contracts in that 2005 agreement. And that's something, as the District Court found and is not disputed, we don't have here. There are some allegations in this case that intellectual property that belonged to the plaintiffs was, I'll use their words, effectively stolen in this case and incorporated by their Chinese antagonists here. Why wouldn't the theft of the IP, not asking you to comment whether it's true or not, but why wouldn't that be enough? So, Your Honor, the theft of the IP, first of all, I just note there are no infringement or misappropriation claims in this lawsuit on which the court could ground jurisdiction. But even so, a foreign IP infringement, which is what we have here, does not have a direct effect in the United States just because the plaintiff is located here. That's the Bell Helicopter case. And here, all of the infringement that is alleged to have occurred happened overseas in China. And I think it could be that the infringement allegations or the theft allegations were all tied in to the fraudulent scheme that's at the heart of the plaintiff's theory, that this was a fraudulent scheme that began with multiple misrepresentations targeted to a company in the United States to induce them into entering into this relationship. And then that led to the conduct in China. So what do we do with all of the misrepresentation allegations in this case and how does it fit into the analysis of the contractual-based claims? Well, Your Honor, the misrepresentation claims, I would first step back and note that all of that is based on statements allegedly made by the mayor of Wuhan, Mayor Lee, at a single meeting in Los Angeles in 2003. That meeting was followed by two years of extensive negotiations where Mr. Chow went to China. He went to Wuhan to see the factory he was going to buy. Went to Hong Kong. That all of the contract was signed overseas. You know, grounding jurisdiction in the comments of a city official who did not have authority to be talking on behalf of Hubei province, and I'm happy to talk further about that, and also did not have authority to be speaking on behalf of Wuhan Holdings, is, you know, one, far removed from the conduct that actually injured the plaintiff, which all occurred in China, and also is not sufficiently significant to constitute, you know, the sort of significant context with the U.S. that would be needed to trigger the commercial activity exception. With respect, you know, thinking about the conduct that did happen in the U.S., you know, again, that all refers to Mayor Lee's conduct, and as I noted that we don't think that conduct would be sufficiently significant to ground jurisdiction. We also would note that the district court found, and we think the record, you know, And there's no dispute here that actual authority is what he would need to have to be able to attribute or link jurisdiction through his conduct. The district court looked at, for example, the declaration of Professor Zhao, the dean of the Wuhan Law School. His declaration was unrebutted, and he went through in great detail in Section 1 of his declaration all of the structure and explained why a city's mayor, like Mayor Lee, does not have authority to act on behalf of the superior government and does not have authority to negotiate on behalf of a state-owned enterprise. And that declaration was unrebutted, and the district court in his decision goes through the additional evidence that indicates no actual authority on the part of Mayor Lee. So kind of pulling this all together, you know, as we noted in our briefing, you know, Hubei province did not engage in commercial activity here, so there's this independently dispositive reason that the dismissal has to be affirmed. With respect to Hubei province, it didn't engage in commercial activity of its own, and it did not have the day-to-day control over Wuhan Holdings that would be needed, and certainly Mayor Lee did not have actual authority to work for it. And with respect to Wuhan Holdings and Hubei as well, we don't have the conduct, sorry, the suit here is based upon the events in China. With respect, council noted the personal jurisdiction and active state. We would, it's our view that, you know, this case falls under the Foreign Sovereign Immunities Act, but if personal jurisdiction and active state were to be considered, that it would be appropriate to send those issues back to the district court to make the necessary factual findings in the first instance, as the court does in the ordinary course. There's also a form nonconvenience issue that would need to be decided on remand. So we're going to be, you know, the district court would be needing to make some findings in any event. If there are no further questions, I thank the court. Thank you very much, council. All right, we'll give you a minute. Thank you, Your Honor. Sometimes it takes a while to complete a scheme to defraud. And at the heart of this case is, my client was led down this path into this transaction because a group of government officials came to Los Angeles, met with him and said, you come, you negotiate, you do this contract, and we're going to make sure you're taken care of. And it took a while after he got there and got the factory running and turning a profit for that scheme to turn around. Council made reference to clear error. There really are no truly any facts that are in dispute in the district court's order. Ultimately, the question of whether there was authority, things like that, those are going to be legal conclusions that this court's going to draw on, what is largely an undisputed record. I would say that the Wells Art contract, the issue there is there is a breach of contract. That is a legally significant act with a United States company that's based in Pomona. The case, yes. Your opposing counsel seems to suggest that there wasn't really a contract because not all the terms were agreed to, for example, where performance was to take place. Your Honor, I don't know that that was the position, but if it was, that's absolutely not true. The record site was given to the court. There's a signed contract. What counsel is referring to is that there wasn't a place identified in this contract for the parts and things that had been negotiated with Wells Art to be shipped. But you can see in the contract that Wells Art is the purchasing party. It's located in Pomona. There's insurance references to marine shipments. Do we know that the contract was, in fact, breached? Unfortunately, yes. Mr. Chau, both of the Chau declarations explain what happened. When the cases talk about a direct and immediate consequence, they mean things like oil prices aren't affected because of what happened. This was a direct legally significant act. In Adler, the direct effect was that Adler used the U.S. Meals and Wires to commit bribery. It doesn't mean that there has to be an ‑‑ it just doesn't mean what counsel wants it to mean. The intellectual property point that was referred to, the infringement isn't really the issue. The issue is our client took that machine over to China and it was kept. They don't have it anymore. They lost that property. And just in closing, because I know that I'm out of time, if the court doesn't have further questions, I would just say that Congress in the FSIA wanted to recognize that when governments act like commercial actors, when they go and buy and sell businesses, then their immunity from suit is gone. And the actual authority, the point that was made, it's absolutely there. My client's declaration talks about all of the times when the Wuhan government officials went over to the U.S. that's undisputed and commercial. They went on a trip that the defendants admit was sanctioned by the Hubei government. Some of those officials, it's undisputed in this record, went over and met with my client. The people who did made the misrepresentations that are at the heart of this case. It's undisputed and it's commercial. And after that meeting, this is in the Chao declarations, multiple Hubei officials confirmed that that visit was part of a Hubei-sanctioned event. Essentially, they ratified it. If they didn't have the authority to go there when they did, all of the undisputed evidence shows that they agreed that it was. And then holdings, defendant holdings, it's undisputed, went on to negotiate a deal with my client through faxes and letters that were directed here. Hubei, and this is my very last point, Hubei, the government, required revisions to these contracts and only would approve the contract with those revisions made. That's commercial activity by Hubei. I thank the court for its time, and we'd ask that the court reverse and that the court do address the personal jurisdiction and active state issues so that we can get this case off the ground. Thank you. All right. Thank you, counsel. Intercontinental Industries v. Huen State-Owned Industrial Holdings is submitted.
judges: Wardlaw, Nguyen, Owens